UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
BROOKHAVEN MEMORIAL HOSPITAL
MEDICAL CENTER, INC., EASTERN LONG
ISLAND HOSPITAL, INC., GOOD SAMARITAN
HOSPITAL MEDICAL CENTER, THE GRIFFIN
HOSPITAL, JOHN T. MATHER MEMORIAL
HOSPITAL OF PORT JEFFERSON, NEW YORK,
INC. (d/b/a JOHN T. MATHER MEMORIAL
HOSPITAL), LONG BEACH MEDICAL CENTER,
MERCY MEDICAL CENTER, NASSAU HEALTH
CARE CORPORATION (d/b/a NASSAU
UNIVERSITY MEDICAL CENTER), CHS
SERVICES INC. (d/b/a ST. JOSEPH HOSPITAL),
(f/k/a NEW ISLAND HOSPITAL); CENTRAL
SUFFOLK HOSPITAL (d/b/a PECONIC BAY
MEDICAL CENTER), ST. CATHERINE OF
SIENA MEDICAL CENTER, ST. CHARLES
HOSPITAL & REHABILITATION CENTER (d/b/a
ST. CHARLES HOSPITAL), ST. FRANCIS
HOSPITAL, ROSLYN, NEW YORK (d/b/a ST.
FRANCIS HOSPITAL); ST. LUKE'S CORNWALL
HOSPITAL, SAINT MARY'S HOSPITAL, INC.,
SOUTH NASSAU COMMUNITIES HOSPITAL,
THE SOUTHAMPTON HOSPITAL
ASSOCIATION (d/b/a STONY BROOK
SOUTHAMPTON HOSPITAL), (f/k/a
SOUTHAMPTON HOSPITAL); STONY BROOK
FOUNDATION, INC. (d/b/a STONY BROOK
UNIVERSITY HOSPITAL), LEGACY
WATERBURY HOSPITAL, INC. (d/b/a
WATERBURY HOSPITAL), NYU WINTHROP
HOSPITAL (f/k/a WINTHROP UNIVERSITY
HOSPITAL), YALE-NEW HAVEN HOSPITAL,
INC.

                    Plaintiffs,

  -against-

ALEX AZAR, in his official capacity as Secretary of
the United States Department of Health and Human
Services

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPLAINT**

Civil Action No. 18-cv-1735

4799181v.8

Plaintiffs Brookhaven Memorial Hospital Medical Center, Inc., Eastern Long Island Hospital, Inc., Good Samaritan Hospital Medical Center, The Griffin Hospital, John T. Mather Memorial Hospital Of Port Jefferson, New York, Inc. (d/b/a John T. Mather Memorial Hospital), Long Beach Medical Center, Mercy Medical Center, Nassau Health Care Corporation (d/b/a Nassau University Medical Center), CHS Services Inc. (d/b/a St. Joseph Hospital), (f/k/a New Island Hospital); Central Suffolk Hospital (d/b/a Peconic Bay Medical Center), St. Catherine Of Siena Medical Center, St. Charles Hospital & Rehabilitation Center (d/b/a St. Charles Hospital), St. Francis Hospital, Roslyn, New York (d/b/a St. Francis Hospital); St. Luke's Cornwall Hospital, Saint Mary's Hospital, Inc., South Nassau Communities Hospital, The Southampton Hospital Association (d/b/a Stony Brook Southampton Hospital), (f/k/a Southampton Hospital); Stony Brook Foundation, Inc. (d/b/a Stony Brook University Hospital), Legacy Waterbury Hospital, Inc. (d/b/a Waterbury Hospital), NYU Winthrop Hospital (f/k/a Winthrop University Hospital), Yale-New Haven Hospital, Inc. (collectively, the "Hospitals" or "Plaintiffs"), by their attorneys, Garfunkel Wild, P.C., for their Complaint against the Defendant, Alex Azar, in his official capacity as Secretary of the United States Department of Health and Human Services (the "Secretary"), alleges as follows:

**Introduction**

1.     This action arises from a decision by the Secretary concerning the computation of payments made for inpatient hospital services under the Medicare prospective payment system.

2.     Specifically, Plaintiffs, a group of hospitals located in New York and Connecticut, challenge the Secretary's decision to include clearly aberrant data from Brunswick Medical Center ("Brunswick"), a struggling hospital in Suffolk County, New York, when developing the annual wage index calculations for Federal fiscal year ("FFY") 2009. Medicare regulations

2

provide for the exclusion of aberrant data when making such calculations, and the Secretary, through Medicare Administrative Contractors ("MAC"s),[1] applied these regulations to exclude the data of 37 other hospitals. However, he inexplicably failed to exclude Brunswick's data, regardless of the fact that Brunswick's average hourly wage had dramatically dropped due to its ongoing financial difficulties.

3. Consistent with the Medicare statutes and regulations, the Hospitals submitted their objections concerning FFY 2009 to the Provider Reimbursement Review Board ("PRRB" or the "Board"). The Board, although recognizing that the data at issue had dramatically decreased from the prior year, denied the appeal, because the Hospitals had not demonstrated that the data was comparable to the data from the 37 other hospitals that had been excluded.

4. This is an arbitrary, impractical, and unprecedented standard. Thus, as detailed below, the Hospitals seek judicial review of the Board's decision because the legal standard that the Board applied is improper, arbitrary, capricious, and otherwise contrary to law.

## The Parties

5. Brookhaven Memorial Hospital Medical Center, Inc. is a hospital located in Suffolk County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

6. Eastern Long Island Hospital, Inc. is a hospital located in Suffolk County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

---

[1] The Medicare Administrative Contract was formally known as the Fiscal Intermediary.

3

4799181v.8

7. Good Samaritan Hospital Medical Center is a hospital located in Suffolk County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

8. The Griffin Hospital is a hospital located in New Haven County, Connecticut, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

9. John T. Mather Memorial Hospital Of Port Jefferson, New York, Inc., doing business as John T. Mather Memorial Hospital, is a hospital located in Suffolk County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

10. Long Beach Medical Center is a hospital located in Nassau County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

11. Mercy Medical Center is a hospital located in Nassau County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

12. Nassau Health Care Corporation, doing business as Nassau University Medical Center, is a hospital located in Nassau County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

4799181v.8

13. CHS Services Inc., doing business as St. Joseph Hospital, formerly known as New Island Hospital, is a hospital located in Nassau County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

14. Central Suffolk Hospital, doing business as Peconic Bay Medical Center, is a hospital located in Suffolk County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

15. St. Catherine of Siena Medical Center is a hospital located in Suffolk County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

16. St. Charles Hospital & Rehabilitation Center, doing business as St. Charles Hospital, is a hospital located in Suffolk County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

17. St. Francis Hospital, Roslyn, New York, doing business as St. Francis Hospital, is a hospital located in Nassau County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

18. St. Luke's Cornwall Hospital is a hospital located in Orange County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

19. Saint Mary's Hospital, Inc. is a hospital located in New Haven County, Connecticut, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

20. South Nassau Communities Hospital is a hospital located in Nassau County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

21. The Southampton Hospital Association, doing business as Stony Brook Southampton Hospital, formerly known as Southampton Hospital, is a hospital located in Suffolk County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

22. Stony Brook Foundation, Inc., doing business as Stony Brook University Hospital, is a hospital located in Suffolk County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

23. Legacy Waterbury Hospital, Inc., doing business as Waterbury Hospital, is a hospital located in New Haven County, Connecticut, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

24. NYU Winthrop Hospital, formerly known as Winthrop University Hospital, is a hospital located in Nassau County, New York, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

25. Yale-New Haven Hospital, Inc. is a hospital located in New Haven County, Connecticut, licensed to provide inpatient hospital services under Article 28 of the New York Public Health Law.

26. All of the Plaintiffs participated in the Medicare Program and were subject to the Medicare Prospective Payment System during the fiscal year beginning January 1, 2005 and

ending December 31, 2005.[2] For FFY 2009, their MAC was National Government Services (formerly Empire Medicare Services).

27. Defendant Alex Azar is currently the Secretary of the United States Department of Health and Human Services. He is the federal officer legally responsible for administering the Medicare Program. The Secretary, through his designated agent, the PRRB, has issued a final administrative decision, denying the Hospitals' claim that the MAC arbitrarily and capriciously chose to include aberrant data in the Nassau-Suffolk wage index.

## Jurisdiction and Venue

28. This lawsuit arises under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ccc (the "Medicare Act"), and seeks direct judicial review under 42 U.S.C. § 1395oo of the January 19, 2018 decision denying the Hospitals' appeal of the MAC's final determination regarding the calculation of the Hospitals' Medicare reimbursements for FFY ending December 31, 2003.

29. Jurisdiction is therefore proper in this Court pursuant to 42 U.S.C. §§ 1395ii and 1395oo(f).

30. Because the majority of the Plaintiffs have their principal places of business in located in either Suffolk or Nassau Counties in New York, venue is proper in this Court under 42 U.S.C. § 1395oo and 28 U.S.C. § 1391.

---

[2] Wage indexes are calculated using data from prior years. Therefore, the FFY 2009 wage index was calculated using data from 2005.

7

4799181v.8

## Summary of Relevant Facts

### The Medicare Program

31. Pursuant to provisions of the Social Security Act, the Secretary, through the Centers for Medicare & Medicaid Services ("CMS"), sets annual rates for healthcare providers under the Medicare's Prospective Payment System ("PPS"). Hospitals are classified into geographically related groups and are reimbursed for services provided to Medicare beneficiaries based on a national average payment. 42 U.S.C. § 1395ww(d). For each fiscal year, hospitals' payments are adjusted, in part, to reflect the regional variations in hospital wage levels. 42 U.S.C. § 1395 ww(d)(3)(E).

32. To establish this adjustment, which known as the wage index, CMS is authorized to collect wage cost related data from hospitals for each fiscal year. *See* 42 C.F.R. § 412.63(w)(1); *see* 73 Fed. Reg. 48434-01, 48581 (Aug. 19, 2008); *see also* 71 Fed. Reg. 47870-01, 48013 (Aug. 18. 2006). Then, CMS averages the wage costs for hospitals within each geographic group. *See* 42 C.F.R. § 412.63(w)(1). This average is intended to reflect the region's market conditions, and thus, wage-related costs. *See* 42 C.F.R. § 412.63(w)(1); 73 Fed. Reg. 48434-01, 48581.

33. For this process, CMS contracts out its payment and audit functions to insurance companies known as MACs. MACs determine payment amounts due to healthcare providers under the Medicare law and interpretative guidelines published by CMS. *See* 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

### The Procedure For Resolving Or Excluding Aberrant Data

34.     In its Final Rule for Inpatient PPS for FY 2009, CMS explained that the wage index calculation involves an intensive review of the collected wage data, and a key part of this review is audits, edits, and other procedures designed to identify aberrant data. *See* 73 Fed. Reg. 48434-01, 48581-48582. Specifically, MACs are to review the collected wage data, and identify and remove aberrant data. *See e.g.,* 73 Fed. Reg. 48434-01, 48581-48582.

35.     The only wage index review process evidenced in CMS's published regulations is the Hospital Wage Index Desk Review Program used by the MACs. This process is designed to check the clerical and mathematical accuracy of hospitals' wage data and "detect any aberrancies that fall outside of HCFA's established thresholds for possible resolution." *JFK-Raritan Bay-Hunterdon 03 Wage Index Group v. BlueCross BlueShield Ass'n/Riverbend Gov't Benefits Administrator,* PRRB Dec. No. 2007-D2, at p. 6, October 11, 2006.

36.     CMS also set out the following procedure for excluding aberrant data from the Wage Index Calculation:

> We asked our fiscal intermediaries to revise or verify data elements that resulted in specific edit failures. While some of the edit failures were resolved, we did remove the wage data of some hospitals from the. . . wage index.

73 Fed. Reg. 48434-01, 48581.

37.     CMS does not share with providers the thresholds it uses to identify aberrant data. However, upon information and belief, CMS uses a metric that a wage decrease of more than 10% from the prior year is aberrant and should be excluded. Indeed, in the decision issued in this case, the PRRB noted that "[b]oth parties seemed to agree that a swing of **less** than 10%

9

4799181v.8

from one year to the next does not necessarily mean that the data is aberrant." Exhibit A, which is a copy of the PRRB's decision in this matter, (emphasis in original). Moreover, in a past appeal, the Board has held that, when a hospital's wage data decreased by 10% compared to the previous year, as a result of bankruptcy, it should not be included in the wage index. *See Battle Creek, MI MSA FY 2006 Wage Index Group v. Wisconsin Physicians Service*, PRRB Dec. No. 2013-D12, at p. 5-11, April 25, 2013.

**Nassau-Suffolk CBSA**

38. During FFY 2009, CMS classified the Hospitals to the Nassau-Suffolk CBSA for purposes of the wage index calculation.

39. The Nassau-Suffolk CBSA for FFY 2009 also included nonparty Brunswick Medical Center, a family-owned, for-profit hospital located in Amityville, on the south shore of Long Island.

**Brunswick Medical Center**

40. Brunswick was the only for-profit Long Island hospital in the Nassau-Suffolk CBSA during FFY 2009.

41. Beginning 2001, Brunswick experienced several well-publicized operational difficulties. Specifically, a legal dispute arose among Brunswick's family member owners, and in December 2001, the Supreme Court of New York entered an order appointing a receiver, J. Stewart McLaughlin, to operate the facility.

42. Despite the receivership, Brunswick continued to deteriorate. Since the management issues were well-publicized, there was a staff exodus. Private practice physicians

also applied for privileges at other hospitals in the area, thereby referring their patients to other hospitals instead of Brunswick. With the staff shortages, Brunswick began putting in requests to turn away ambulances transporting patients seeking emergency services. As the volume of work decreased, Brunswick's revenue declined.

43. Brunswick's problems were not driven by external environmental factors, nor were they representative of other hospitals in the region. Indeed, while Brunswick was declining, the four hospitals in reasonably close proximity to Brunswick – South Nassau Communities Hospital, Long Beach Medical Center, Good Samaritan Hospital, and Southside Hospital were all experiencing growth in terms of inpatient admissions, emergency department visits, and total discharges.

44. Brunswick's difficulties ultimately led to Brunswick seeking Chapter 11 bankruptcy protection in 2005.

**Brunswick's Wage Data Was Abnormally Low**

45. During the cost reporting period ending December 31, 2005, Plaintiffs, together with Brunswick, supplied wage data to CMS. Because wage indexes are calculated using data from prior years, the 2005 data was submitted for calculation of the FY 2009 wage index.

46. The wage data reported by Brunswick resulted in the lowest average hourly wage of any hospital in the CBSA, by a significant margin. In 2005—the year Brunswick declared bankruptcy, Brunswick's average hourly wage dropped by over nineteen percent from the prior

11

year, yielding an average hourly wage of $22.69. *See* Exhibit B which is a copy of Plaintiffs' Joint Position Paper, Exhs. P-5, P-6.[3]

47. No other hospital in the Nassau-Suffolk CBSA reported comparable wage data, nor did any of the other Long Island hospitals experience such a striking drop in their wage data, as compared with Brunswick. The average hourly wage amounts for the other hospitals in the CBSA all exceeded $32, and most were larger than $37. *See* Exhibit B, Exh. P-6. Brunswick's average hourly wage FY 2009 was, in fact, a full $10.30 less than the next lowest hospital, Long Beach Medical Center. *See id.* Furthermore, at an aggregate level, the average hourly wage of hospitals in the Nassau-Suffolk CBSA, other than Brunswick, increased by 11.82% over the three year period of 2003 to 2005. *See* Exhibit B, Exhs. P-4, 5, and 6.

**The MAC Was Notified That Brunswick's Low**
**Wage Data Resulted From Its Financial And Management Problems**

48. As a part of the MAC's desk review process, the MAC contacted Brunswick with questions regarding its wage data. Specifically, the MAC requested clarification concerning the "substantial decrease[s]" in certain areas of Brunswick's average hourly wage, noting the (1) "substantial decrease in Contract Labor Average Hourly Wage . . . from 99.89 in 2004 to 0.00 in 2005," (2) "substantial decrease in the Wage-Related Costs . . . from 5,475,784 in 2004 to 3,732,038 in 2005," and (3) "substantial decrease in the Adjusted Average Hourly Wage . . . from 25.35 in 2004 to 20.48 in 2005." *See* Exhibit B, Exh. P-30.

49. In response, Brunswick's Director of Finance explicitly advised the MAC that its wage data resulted directly from Brunswick's financial difficulties, explaining that "Brunswick Hospital Center went through an internal reorganization following the closure of the acute care

---

[3] Exhibits attached to the Final Joint Position Paper are referred to by their original exhibit number.

12

facility in September 2005." Exhibit B, Exh. P-31. Closures to its acute care division required staff reductions and restructuring that had resulted in decreased wage related costs. *Id.* Additionally, "the Hospital filed for Chapter 11 bankruptcy protection in October 2005 necessitating additional layoffs. The above factors resulted in the decrease of wage related costs in 2005 compared to 2004." *Id.*

50.     Upon receipt of a second inquiry, Brunswick reiterated this information, stating, "[i]n 2005, the Hospital closed its acute care facility and filed for bankruptcy protection . . . and substantially decreased the contract labor costs." Exhibit B, Exh. P-32. "**Due to the above**, the contract labor average hourly wage **decreased substantially** in 2005 as compared to other years." *Id.* (emphasis added).

**<u>The 2009 Wage Index Determination</u>**

51.     On October 3, 2008, CMS published a final determination for all providers in the FY 2009 wage index, which included the 2009 Nassau-Suffolk CBSA. While Brunswick's data was included, 37 other hospitals were excluded from their respective groups because:

> [W]e identified and excluded 37 providers with data that was too aberrant to include in the proposed wage index, although we stated that if data elements for some of these providers were corrected, we intended to include some of these providers in the FY 2009 final wage index. However, because some unresolved data elements were included in the proposed FY 2009 wage index, we instructed fiscal intermediaries/MACs to complete their data verification of questionable data elements and to transmit any changes to the wage data no later than April 14, 2008. While the data for four hospitals were resolved, the data for two other hospitals were identified as too aberrant to include in the final wage index. Therefore, we determined that the data for 35 hospitals should not be included in the FY 2009 final wage index. 73 Fed. Reg. 48434-01, 48581.

13

4799181v.8

52.     The inclusion of Brunswick led to a wage index of 1.2686. If Brunswick had been properly excluded, the wage index would have increased to 1.2747. Including Brunswick in the wage index or 2009 cost the Hospitals, as a group approximately $4,497,242 in reimbursement. *See* Exhibit B, Exh. P-25.

**The Group Appeal**

53.     All Hospitals timely filed appeals of the MAC's determinations to the PRRB in accordance with 42 U.S.C. § 1395oo.[4] Each Request for Board Hearing challenged the MAC's wage index calculations because they relied, in part, on the clearly aberrant Brunswick wage data. Exhibit B, Exh. P-9. The Hospitals also estimated that the adverse impact of the adjustments was expected to far exceed the $10,000 threshold for each Hospital. *See id.*

54.     In accordance with its procedures, the PRRB formed a Group Appeal for Federal fiscal year 2009, which was named the Nassau-Suffolk FFY 2009 Wage Index Group. Exhibit B, Exh. P-17. The 2009 Group closed on April 29, 2010. *See id.*

55.     On April 9, 2015, the Hospitals and the MAC each filed their respective Final Position Papers. *See* Exhibit B; Exhibit C, which is a copy of the MAC's final position paper.

56.     A live hearing was held on November 4, 2015.[5] At the hearing, Kevin Dahill, CEO of the Nassau-Suffolk Hospital Council, and Dale Baker, of Baker Healthcare Consulting,

---

[4]     The Providers also appealed the exclusion of certain unfunded pension and other post-retirement benefit costs. The two issues were divided into separate appeals, and the pension-related issue is not part of the instant appeal.

[5]     When Plaintiffs filed their appeal, there were two other appeals pending on behalf of Plaintiffs before the Board for FFYs 2007 and 2008, respectively. Because the issues in the appeals overlapped, the Board agreed to hear all three appeals in a single hearing, and the parties submitted joint briefs, addressing all three appeals at once. The appeals for FFYs 2007 and 2008 have since been resolved and are not subject to further review.

14

testified on the Hospitals' behalf. A transcript of the November 4, 2015 proceeding is attached as Exhibit D, Exh. P-35.

57. During the hearing, Mr. Dahill testified as to Brunswick's financial and management difficulties during the relevant time period, and Mr. Baker testified regarding wage data for Brunswick and the hospitals in the Nassau-Suffolk CBSA, including Brunswick's aberrant data that should have been excluded. Mr. Baker explained, among other things, that where the data drops over 10% from the prior year, CMS has a clear indication that the data may be aberrant.

58. Subsequent to the hearing, both parties submitted joint post-hearing briefs. Attached respectfully as Exhibits D and E are Plaintiffs' and Defendant's post-hearing briefs. At the Board's recommendation, the Hospitals also submitted a supplemental exhibit, a narrative description of their spreadsheet exhibit. Exhibit D, Exh. P-34.

**The Provider Reimbursement Board's Decision**

59. By order dated January 19, 2018, the PRRB denied the Hospitals' appeal. Exhibit A.[6]

60. The Board acknowledged that Brunswick's wage data decreased dramatically from the prior year, but ruled that the Hospitals did not establish that Brunswick's wage data was comparable to the 37 other hospitals which the MAC had chosen to exclude from the FY 2009 wage index calculation. Exhibit A, p. 5. The Board also seemed to think that the MAC should be excused for not recognizing the issues Brunswick was facing, despite the direct

---

[6] As set forth above in footnote 5, this decision concerns three appeals, including those for FFY 2007 and 2008, which are not subject to this action.

15

communications from Brunswick informing the MAC that its wages had sharply dropped due to financial difficulties, closures, and bankruptcy. *See id.*

61. The Board's decision was improper, arbitrary, capricious, and otherwise contrary to law. The Board has never before applied the standard, in cases similar to the one at bar, that providers must compare the data they wish to be excluded to other data that was, in fact, excluded. There was no reason for the Hospitals to believe that such a standard of proof was required.

62. Indeed, the standard posed by the Board would be difficult, if not impossible, to meet. CMS does not publish its specific grounds for excluding providers from the wage index – in fact, upon information and belief, in 2009 it did not even publish which providers have been excluded. There would be no way for the Hospitals to know which providers were excluded, and why, without subpoenaing each MAC and CMS office that processed each excluded provider's data, or, if the providers are unknown, every MAC in every region of the country – a herculean task unlikely to result in comprehensive evidence.

63. And even if such data were to be obtained, it is not likely to engender an apples-to-apples comparison. CMS has not set a clear standard for what constitutes aberrant data, but it is likely to comprise data with a variety of different issues, including, at the very least, data that is excessively high as well as data that is low. The data for other hospitals may have been excluded for reasons other than a 19% wage decrease – such exclusion would not mean that Brunswick's data was not equally aberrant and deserving of exclusion. It would just be for different reasons.

64. The Board also arbitrarily and inexplicably broke from its own prior precedent in *Battle Creek,* PRRB Dec. No. 2013-D12, a fact pattern comparable to the one at bar, in which no such comparison was required.

65. Finally, the Board appeared to absolve the MAC of any knowledge of Brunswick's difficulties, despite direct evidence that the MAC had been so-informed.

## Cause of Action

66. Plaintiffs repeat and re-allege each and every allegation set forth above as if more fully set forth herein.

67. The Provider Reimbursement Review Board's decision, annexed as Exhibit A, was improper, arbitrary, capricious, and otherwise contrary to law, including relevant provisions of the Medicare Act, Medicare Regulations, and the Administrative Procedure Act.

WHEREFORE, Plaintiffs demands judgment in their favor against Defendant (a) reversing the Provider Reimbursement Review Board's decision, annexed as Exhibit A, and remanding the matter to the Secretary for further proceedings; (b) ordering Defendant to pay Plaintiffs' attorneys' fees, costs, and expenses pursuant to 28 U.S.C.A. § 2412; and (c) granting Plaintiffs such other and further relief as this Court may deem just and proper.

Dated: Great Neck, New York
March 20, 2018

        GARFUNKEL WILD, P.C.
        *Attorneys for Plaintiff NYU Winthrop Hospital (f/k/a Winthrop University Hospital)*

By:   */s/ Courtney A. Rogers*
       Roy W. Breitenbach
       Courtney A. Rogers
       Gillian Barkins

111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200

4799181v.8